## UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

## MONROE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CASE NO. 3:19-CR-00398-01 |
| VERSUS | JUDGE TERRY A. DOUGHTY |
| EUGENE THURMAN (01) | MAG. JUDGE KAREN L. HAYES |

### REPORT AND RECOMMENDATION

Before the undersigned Magistrate Judge, on reference from the District Court, is a motion to suppress [doc. # 25] filed by defendant, Eugene Thurman.   For reasons stated below, it is recommended that the motion be DENIED.

### Background

On the evening of May 10-11, 2019, the Monroe Police Department ("MPD") responded to a call of shots fired at the Parkview Apartments – a high crime area on the southside of Monroe.   Responding units retrieved 17 rifle rounds at the scene and heard 15 more shots fired while they were there.

At 4:03 a.m. on May 13, 2019, Crime Stoppers of North Delta received an anonymous call stating that Eugene Thurman was a convicted felon in possession of an assault rifle, and that he lived at the Parkview Apartments, Unit No. 74, with his girlfriend and her two children.

Later on the morning of May 13, or early that afternoon, MPD detectives, Triche Passman, James Schmitz, Doug Lambert, and Snowberger, plus at least two other uniformed officers, went to Parkview Apartments, Unit No. 74 to conduct a "knock and talk" to follow-up on the crime stoppers tip.   Upon arrival, the detectives encountered Eugene Thurman at the front door of the apartment.

Detective Schmitz identified himself to Thurman, and, in due course, told him the purpose of the visit.   After a young woman and her child were removed from the apartment, Thurman denied possessing a gun.   Thurman also admitted that he "frequented" the apartment, but that it was not his house.   Thurman declined the detectives' request for permission to look inside the residence for a weapon or for anyone else.

Between four and five minutes after the encounter began, the detectives decided to make a protective sweep of the apartment to make sure that no one else was inside.   Within 30 seconds, the detectives observed an AK-47 assault rifle propped up against a wall in the far corner of the back bedroom, plus a baggie of marijuana on the night table, together with digital scales.   At that point, detective Lambert placed Thurman in handcuffs.   The officers conducted a brief, follow-up sweep of the apartment to make sure that they had not overlooked someplace where someone might have been hiding.

The officers then exited the apartment and went to apply for a search warrant, which they obtained shortly before 1:30 p.m.   The subsequent search of the apartment resulted in the seizure of a sandwich bag containing suspected marijuana, a digital scale, Eugene Thurman's I.D. card, one 7.62 x 39 unspent round, an AK-47 Century International Model M70 AB2 SN:M70AB07247, an AK-47 magazine containing (11) 7.62 X 39 rounds, a Glock 40 magazine (empty), and a large leather case containing several 30-06 rounds.

On December 18, 2019, a federal grand jury returned a one-count indictment against Eugene Thurman for knowingly possessing a firearm and ammunition (a Century International, Inc. rifle, model: M70AB2, caliber: 7.62x39mm) after having previously been convicted of a felony in violation of 18 U.S.C. § 922(g)(1).   The indictment also seeks forfeiture of the firearm, two magazines, and ammunition.   Thurman was arraigned on January 31, 2020, and entered a plea of not guilty.

On April 8, 2020, Thurman filed the instant motion to suppress all of the aforementioned evidence seized during the May 13, 2019, search of Apartment 74, Parkview Apartments, Monroe, Louisiana.   Following delays for an August 11, 2020, hearing, and post-hearing briefing, the matter is now before the court.

## Relevant Testimony, Video and Documentary Evidence

Three witnesses testified at the approximately two and one-half hour-long hearing – two called by the government:   detectives Triche Passman and Matt Schmitz; and one called by defendant:   detective Doug Lambert.   The government, without objection, introduced 24 exhibits that were accepted into evidence.   [doc. # 54].   Eighteen of the exhibits represent photographs that were taken inside of Apartment No. 74, one exhibit was the search warrant application; another exhibit was the crime stoppers report; and one exhibit was a U.S. Department of Housing and Urban Development form showing that Karlefa Jones was the tenant for Apartment No. 74.   *Id.*   The remaining three exhibits were body-camera videos of the encounter that were taken by detectives, Lambert, Schmitz, and Passman.   *Id.*

Defendant introduced eight exhibits of his own, most of which overlapped with the government's exhibits:   Exhibit 1 – map of Parkwood Apartments; Exhibit 2 – HUD lease form for Apartment No. 74; Exhibit 3 – Crime Stoppers tip; Exhibit 4 – search warrant application; Exhibit 5 – search warrant and return; Exhibits 6-8 – body cam videos from Lambert, Schmitz, and Passman.   [doc. # 55].

The court summarizes relevant testimony and evidence, as follows:

Lieutenant Triche Passman is a 28-year veteran of the Monroe Police Department ("MPD").   (Hearing Transcript, pg. 10) (hereinafter abbreviated as "Tr." followed by the page number).   He also is a task force officer with the Bureau of Alcohol, Tobacco, Firearms, and Explosives – a position that he has held for about nine years.   *Id.*   James Matthew Schmitz is a

3

corporal with the MPD, with over 18 years of service.   (Tr. 57).   He is assigned to the detective division where he investigates crimes assigned to him by his supervisors.   *Id*.   Douglas Lambert is a detective with the MPD, with sixteen years of service as of 2019.   (Tr. 81-82).   On May 13, 2019, he had not been a detective very long and was still training.   *Id*.

Passman testified that on the morning of May 13, 2018 [sic], they received a crime stoppers tip indicating that Thurman was at 1101 Richwood #2, Apartment No. 74, and was in possession of an assault rifle.   (Tr. 10-11).   According to the crime stoppers report, the caller stated that "Eugene Thurman is a felon and is in possession of an assault rifle . . . Eugene lives at Parkview Apartments with his girlfriend and her two children.   Eugene is known to carry the weapon in a red bag with him."   (Gov.'t Exh. No. 1).   The suspect's address was listed as 1101 Richmond, Monroe, LA, Parkview Apartments, No. 74.   *Id*.   The Parkview Apartments represent a very high crime area that is known for murders, attempted murders, armed robberies, assaults, "domestic," gun trafficking, drug trafficking, and rapes.   (Tr. 13).   Just this year alone, MPD has investigated seven murders at Parkview Apartments.   (Tr. 59).

Approximately thirty hours earlier, MPD had responded to a call for shots fired at the Parkview Apartments, and had retrieved roughly seventeen .223 shell casings,[1] which typically are fired from an assault rifle.   (Tr. 14).   However, officers did not make an arrest and did not find the weapon.   *Id*.

According to Passman and Schmitz, the crime stoppers tip did not provide officers with enough evidence to obtain a search warrant because the officers cannot "go off anonymous information," without "solid facts and probable cause."   (Tr. 15, 60).

---

[1] On cross-examination, Passman conceded that an AK style assault weapon like the one found at the apartment does not fire .223 rounds.   (Tr. 33).   He further admitted that the area where the rounds were found was not the same building where they encountered Thurman.   (Tr. 37).

The officers did a background check on Eugene Thurman and learned that he was a known felon.   (Tr. 15).   Accordingly, they decided to go to the apartment and conduct a "knock and talk."   *Id*.   Passman explained that he had conducted probably hundreds of "knock and talks," which entails going to a house or apartment and trying to make contact with the person in question to talk to them about the information they had received to substantiate whether it was true or not.   (Tr. 16).

The court fashioned the following sequence from the body camera footage from Officers Lambert, Schmitz, and Passman.   While tedious, the video footage represents the most accurate version of events, and appears to reflect the officers' candid, unguarded, and certainly contemporaneous impressions of what transpired.   The court utilized Lambert's body cam as the principal source for the chronology and grafted portions of Schmitz and Passman's cameras into the timeline, as needed to clarify inaudible portions of Lambert's camera.   Schmitz's camera generally was five seconds off of Lambert's camera, but sometimes longer.[2]   Further complicating matters is the fact that the audio and video are not perfectly synchronized.   The officers encounter Thurman roughly two minutes after Lambert's recording began.

The chronology is not exhaustive, and some words and scenes are omitted, particularly largely irrelevant events and discussions that occurred after Thurman was placed in handcuffs. Passman did not activate his body camera and microphone until after Thurman was in handcuffs.

| Elapsed Time on Video | Speaker | Quote or Visual Description by the Court |
|---|---|---|
| 0:01 | | Detectives Schmitz and Lambert are in a vehicle approaching the apartment complex |

---

[2] The discrepancy may be explained by the government's representation that it redacted portions of the recordings on grounds of relevancy.   (Gov.'t Brief, pg. 3 n.4 [doc. # 28]).

| 0:02 | Det. Schmitz | ". . . shooting an AR-15 down here or something.   We got a tip that it is this guy – maybe.   So, we're going to go up there and look, don't really know what to expect." |
|------|--------------|----------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
| 0:10 | Det. Lambert | "Probably not going to answer the door.   I wouldn't answer the door.   I'd be like F – the police." |
| 1:01 |  | At least three police cars roll up to the apartment, which appears to be a series of four-plexes, with two apartments on the ground floor, two on the second floor, and a central passageway with a stairwell in the middle of each four-plex. |
| 1:11 |  | As the officers approach the apartment stairwell, they encounter some young children playing. |
| 1:16 |  | Detectives Schmitz, Snowberger, and Lambert walk into the open-air stair well between the apartment units and proceed upstairs |
| 1:17 | Schmitz | Speaking to the children:   "hey, hey don't run off . . . where's your daddy at?" |
| 1:20 | Child | "He's in the house." |
| 1:27 | Schmitz | "Tell him to come out here . . . your momma in there too?" |
| 1:33 | Child | "Umm, somebody" |
| 1:34 | Schmitz | "Alright tell your daddy to come out" |
| 1:41 |  | Child calls his Dad.   Schmitz observes Thurman walk to the front door from the rear bedroom. |
| 1:52 |  | Officer Snowberger moves some patio furniture away from the door. |
| 1:53 | Schmitz | "Hey man, what's happenin'?" |
| 2:00 | Schmitz | "hey I'm detective Schmitz, Monroe Police.   Are you Mr. Jones?"   Thurman shook his head negatively. |
| 2:08 |  | Officer Schmitz confirms, instead, that he is speaking with Eugene Thurman. |

| 2:12 | Schmitz | "Who lives here?" |
|------|---------|-------------------|
| 2:13 | Thurman | Inaudible |
| 2:14 | Schmitz | "Who's she?" |
| 2:16 | Thurman | "She's my friend" |
| 2:18 | | Around this time, Detective Passman arrives.   At this point, there are four police officers standing in the breezeway.   The officers are wearing protective vests emblazoned with "POLICE."   Three young children are darting about amongst the officers.   Thurman is standing with his back to the apartment entrance door.   The door is ajar. |
| 2:25 | | The children's grandmother arrives downstairs and Detective Schmitz asked them if they wanted to go see her. |
| 2:33 | Schmitz | "Y'all go play with your grandma." |
| 2:35 | Schmitz | To Thurman:   "Anybody else in there?" |
| 2:36 | | One of the children goes inside the apartment.   Officer Snowberger helped push the door open wider.   The door is almost open ninety degrees. |
| 2:41 | Snowberger | To Thurman, whilst gesturing inside:   "Her apartment?" |
| 2:41 | Thurman | "Nah" |
| 2:42 | | The officers observe a woman walking languidly towards the rear of the apartment. |
| 2:44 | Schmitz | To Thurman:   "Your girlfriend's at work?   Who's this?" |
| 2:48 | Lambert | "How old is she?" |
| 2:51 | Thurman | "How old is she?" |
| 2:53 | Lambert | "I said it clearly didn't I? how old is she?" |
| 2:59 | | Thurman directed a little girl inside the apartment to tell her Mom to come out. |

| 3:02 | | The woman walked towards the front of the apartment and stated that she was 24. |
| 3:05 | | Lambert asked the woman if she lived there.   When she said that she did not, Lambert told her to "step out for us." |
| 3:09 | | As the woman stepped out of the apartment and walked past the officers, Snowberger asked Thurman "Who else is in there?" |
| 3:10 | | Thurman denied that anyone else was present. |
| 3:15 | | Detective Passman gestured and directed the woman to move down the hall.   The child who had been in the apartment accompanied her. |
| 3:17 | Schmitz | To Thurman:   "Here's the deal man, we got a tip about you having an AR. I'm just going to cut to the chase. Do you have an assault rifle?   Okay, and I believe it's a credible tip.   So, where's it at?" |
| 3:25 | | Thurman denied having the weapon and disclaimed knowledge of the matter. |
| 3:32 | | Detective Passman placed his hand on Thurman's shoulder so he could pass by him to look inside the open apartment door.   After looking inside, Passman stood in the doorway with his back to the apartment. |
| 3:36 | | Thurman started to walk towards the far end of the stairwell. However, the officers expressed their disapproval with his movement. |
| 3:39 | Schmitz | Talking to Thurman and pointing:   "I want you in this corner right here . . . is where I want you." |
| 3:41 | | Thurman moved to the corner, as instructed. |
| 3:46 | Schmitz | "Someone sold you down the river." |
| 3:47 | Thurman | "I don't got no gun." |
| 3:48 | | Passman is standing sideways in the door to the apartment with his arm on the doorframe blocking passage through the doorway. |

| 3:50 | Schmitz | "Is there a gun in this apartment?" |
|------|---------|-------------------------------------|
| 3:52 | Thurman | "I got nothing in this apartment." |
| 3:53 | Schmitz | "You got a problem with me looking?" |
| 3:54 | Thurman | "It's not my apartment, so if you got a warrant you can definitely go in." |
| 3:58 | Passman | "Oh, I'm going to get in there." |
| 4:00 | Thurman | "I don't have a problem with you getting in there." |
| 4:03 | Passman | "It'll be a lot better for you if you cooperate.   If it's in there let us know now, 'cause we're going to have to get a warrant." |
| 4:07 | Thurman | "I got nothing, not one thing . . . I know I already told you this . . . [inaudible]" |
| 4:19 | Schmitz | "Well if that's the case, and it ain't here, we're gone . . ." |
| 4:23 | Schmitz | "We're not here to look for no dope, no weed, or nothing like that." |
| 4:25 | | Passman is standing in the doorway looking into the apartment, halfway inside.   He pushed the door wider and peered behind the door towards the kitchen. |
| 4:27 | Thurman | "I work every day.   I work for Monroe City." |
| 4:28 | Lambert | "Oh do you?   I wouldn't doubt that." |
| 4:31 | Thurman | "Yeah, I do." |
| 4:35 | Schmitz | "You don't own a red bag with an assault rifle in here?" |
| 4:37 | Thurman | "S___, no." |
| 4:39 | Schmitz | "Do you live here?" |
| 4:40 | Thurman | "Yeah, I frequent here." |
| 4:43 | Schmitz | "Do you *live* here?" |

| 4:44 | Thurman | "I frequent here, but it's not my house." |
|---|---|---|
| 4:45 | Schmitz | "So you *don't* live here? |
| 4:48 | Thurman | "I stay at 1908 Wendell" |
| 4:50 | | Passman continued to stand in the doorway, with one leg inside the apartment as he looked toward the ground.   He reached in and turned on the light switch to the living room.   He did not look down the hallway where the bedrooms were. |
| 4:50 | Schmitz | "What's the lady that gave you permission to be here?" |
| 4:52 | Thurman | "Karlefa Jones" |
| 4:53 | | Passman is standing in the open doorway with his back to the inside of the apartment, and is staring at the ground. |
| 4:55 | Schmitz | "How do I get in touch with her?" |
| 4:59 | Thurman | "I don't have her phone number.   She should be at work." |
| 5:01 | Lambert | "Where does she work?" |
| 5:03 | Thurman | "At Motel 6 . . ." |
| 5:15 | Passman | "Are you on probation or parole?" |
| 5:16 | Thurman | "No sir, I haven't been in trouble in 20 years" |
| 5:18 | Schmitz | "We're just trying to do our job, man." |
| 5:20 | Thurman | "I understand, I understand, that's no problem." |
| 5:21 | | Passman continued to stand in the doorway, with his back to the inside of the apartment. |
| 5:22 | | Schmitz is heard on the phone, trying to reach Motel 6. |
| 5:26 | | Passman turned around to look inside the apartment, with almost his whole body inside, except for his left foot. |

| 5:30 |  | Schmitz is still on the phone trying to reach Ms. Jones.   Thurman and the other officers are engaged in small talk. |
| 5:50 | Snowberger | "There's no gun in here, right?" |
| 5:51 | Lambert | "There's nobody else in here?   That's what I'm worried about." |
| 5:52 | Thurman | "There's nobody in there." |
| 5:53 | Passman | "Alright, we're fixing to clear it." |
| 5:55 | Snowberger | "You don't mind us checking?" |
| 5:56 | Thurman | Inaudible |
| 5:57 | Passman | "We want to make sure nobody else is in there."   Passman still has his back largely turned to the inside of the apartment, with his hands in his pockets. |
| 5:58 | Snowberger | Speaking to Thurman: "it doesn't have to be your house, I mean, you're here.   You're the one taking care of the house while she's gone." |
| 6:03 | Thurman | Inaudible |
| 6:07 | Snowberger | "That's fine. So, you're not okay with us looking?" |
| 6:09 | Thurman | "If you don't have a warrant, I'm not okay with you looking." |
| 6:10 | Passman | Stepping into the apartment, Passman stated, "we're going to clear it, so . . . " |
| 6:11 | Lambert | "Make sure there's nobody else in there." |
| 6:13 |  | Passman drew his weapon and proceeded inside.   Snowberger followed him. |
| 6:16 | Passman | Calling out in a loud voice:   "Monroe Police, anybody else in here?" |
| 6:18 |  | Snowberger first went to the kitchen, which had been visible from the open door.   Passman went straight down the hall towards the back bedrooms. |

| 6:20 | | Lambert and Schmitz remained outside with Thurman |
| 6:28 | Lambert | While they were waiting, Lambert wryly commented to Thurman: "funny how this works." |
| 6:44 | Passman | "Hey, 10-15 him."[3] |
| 6:48 | | Lambert handcuffed Thurman. |
| 6:57 | | Lambert entered the apartment behind Passman and Snowberger. |
| 7:08 | | The officers quickly searched the bathroom at the end of the hall on the right, one bedroom at the end of the hall, and then a second bedroom on the left. |
| 7:18 | | Passman showed Lambert an AK-47 propped up against the wall in the corner of the bedroom.   There is perhaps a little more than one foot between the footboard of the bed and the wall where the gun is situated. |
| 7:24 | | Snowberger pointed out a scale on the night table. |
| 9:07 | Lambert | To Passman:   "do we need to back out and get a warrant now that we seen this?" |
| 9:08 | Passman | "Probably" |
| Passman Cam | Passman | To Schmitz: "hey, let's go ahead and write it up now that we know . . . AK sitting in the corner and weed on the table." |
| 10:00 | | Schmitz is still on the phone trying to reach Ms. Jones. |
| 11:56 | | Over twenty onlookers had gathered across the parking lot. |
| 12:01 | Schmitz | As he looked across the parking lot at the growing crowd, Schmitz stated, "you got a cluster . . . you got a cluster, Douglas." |

---

[3]  "10-15" means to place someone in custody.   (Tr. 24).

| Passman Cam | | Speaking to someone on phone: "hey, uh, came to the door, didn't want us to look, we went ahead and cleared it for people, AK laid up in the corner, with weed laying up on the table.   What we seen was just like a 50 bag, but that was what was in plain view, so. There's scales in there too . . . There may be another one in there for all we know . . ." |
|---|---|---|
| 13:52 | Lambert | Speaking to no one in particular:   "Protective sweeep of the residence." |
| 15:30 | | Schmitz finally gives up trying to reach Karlefa Jones on the telephone. |
| 16:18 on Schmitz Cam ("SC") | Schmitz | "Here's what we're probably fixin to have to do.   We're fixing to have to go write a search warrant for this apartment." |
| 16:44 SC | Schmitz | Standing in front of the still open door to the apartment, Schmitz stated, "Now I smell weed, or I smell . . ." |
| 17:16 SC | Schmitz | To Passman:   "I can go back and write a search warrant, and be done with it." |
| 17:17 SC | Passman | "Let's just do that." |
| 17:21 SC | Passman | Pointing towards Lambert:   "I'm going to have to take him with me.   I'm going to let him write it." |
| 17:16 | Lambert | As Lambert and Schmitz departed, Lambert told some other officers downstairs that it may be 30-40 minutes while they go write a search warrant.    "There's an AK47 in the back corner with some dope." |
| 18:49 | | Lambert and Schmitz are driving back to the station in their police unit. |

| 9:24 | Schmitz | Schmitz called someone on his cell phone and stated, "I know you cussing me right now, uh, it's a cluster down there and I need . . . I need a good hand . . . So, we went down there. It's a cluster. I'll be honest with you. I don't like the way this is going. I think we'll be able to do it, but it's going to take some creative writing. We found the AK in there with this guy and a bunch of dope, from what I understand. So, we can't get anybody else on the phone to come down there – the owner – so we're going back to write a search warrant to search the rest of it for guns and dope. So – well Metro's en route, but I don't know if they're going to want to do it. Triche told us to go write the search warrant. So, me and Doug are headed to the station to write the search warrant.<br><br>Here's the deal, the guy comes out, and I was just as blunt as I could be. Look we got a tip, you got a chopper up in here. And he got frickin' . . . I could see it in his face, and I'm like, uh can we look, do you have a problem with us looking, and he was like no man unless you got a warrant, this isn't my place. And he's kind of squirrelly about why he's even there or anything else like that.<br><br>Triche says we're going to do a protective sweep cause there's another girl that pops up. [Lambert injects] and there's a gun involved. So Triche is like, we're going to do a protective sweep. You don't live here. And so they do the protective sweep and there's an AK laying on the bed [Lambert interjects "a bag of weed and some scales"] and there's dope and some scales on the bed [Lambert interjects, "in plain view"]. And so we come out and we jack him up and he gets a little attitude, and he's going to the station, and we're going to write a search warrant for the rest of the house. You got me? ---- In other words, you feel me? ---- In other words, you feel me?<br><br>Yep, I think, that's right, we're good, we're good, we just need a little hand cause there's a stack, a bunch of people out there. And anyway. It ain't very many of us. There's a bunch of them. You know what I mean? . . . four guys holding the house. You know what I mean? . . ." |

| 22:47 | Lambert | Talking to someone on the phone:  "since we're dealing with a machine gun, or some more people, Passman and Snowberger go ahead and do a sweep to clear the residence and make sure there's nobody in there.   While they're doing that, they see a bag of weed in the back left room where she come out of, and a set of scales, and there's an AK or SDS propped up in the back left corner.   You can just see it.   So, we pulled out and we're going to do a search warrant . . ." |
| 24:28 | Lambert | "We can do the search warrant based on what we saw . . . " |

Later that day, Officer Lambert submitted a search warrant application for 1101

Richwood Road, Apt. 74, which included the following narrative:

> On 5/12/19 MPD officers responded to 1101 Richwood Rd. apt. #74 in reference to a crimestoppers tip.   The tip advised that a Eugene Thomas in Apt. #74 was in possession of an assault style rifle.   Units responding to this area of Parkview apts. on 5/10/19 in reference to shots being fired.   Responding units located 17 spent rifle rounds at the scene.   While officers were there investigating the shots fired they heard approximately 15 more shots fired in the same area.
>
> Upon arrival at Apt. # 74, officers came into contact with Eugene Thurman.   When officers advised him why we were there, he became visibly nervous and shaken. While speaking with him, an odor of marijuana was detected coming from the apartment.   An adult B/F was seen inside the apartment.   She then went down the hall and into last room on the left.   When officers ordered her outside, she too appeared extremely nervous.   Due to the chance of someone else being in the apartment and them being armed with a rifle, a protective sweep of the apartment was performed.   During this sweep, officers observed a large bag of suspected marijuana and a set of scales in plain sight in the back left bedroom.   Officers also observed an AK-47 style assault rifle in plain sight, leaned up in the corner of this same far left room.
>
> Neither Thurman nor the B/F located at the apartment were found to be on the lease. Officers were unable to make contact with the apartment's owner at this time. A search warrant is respectfully requested to enter 1101 Richwood Road 2 Apt. 74 to collect any and all illegal drugs and weapons found inside the residence.

(Gov't Exh. 10).

On May 13, 2019, at 1:27 p.m., the Honorable Wendell Manning of the Fourth Judicial

District Court for the Parish of Ouachita, State of Louisiana signed the search warrant.   *Id*.

The search commenced at 1:29 p.m. on May 13, 2019, and ended at what appears to be 1:45 p.m. that same day.   (Search Warrant Return; Def. Exh. 5).   The items recovered are detailed earlier in this opinion.   *See* discussion, *supra*.

Passman and Schmitz testified that when they encountered Thurman, he appeared surprised and nervous, which they agreed was not uncommon.   (Tr. 16, 61).   However, he was very fidgety and stumbled around with his answers.   *Id*.   Thurman said that he frequented that apartment, but lived at Wendell Drive.   (Tr. 17).   Schmitz found his answers suspicious.   (Tr. 61).

Passman explained that he stood in front of the doorway to the apartment because they did not know if there was a gun inside, and they wanted to make sure that Thurman did not try to go for it.   (Tr. 46).   Passman admitted that he had his back to the door at different periods during the video.   (Tr. 47).   Passman permitted three minutes to lapse between the time that the last person exited the apartment and when he decided to conduct the sweep.   (Tr. 48).

Passman stated that a protective sweep is for officer safety, and it entails looking for persons only – nothing else.   (Tr. 17-18).   Passman has conducted protective sweeps on "many, many" occasions.   (Tr. 18).   Some of the factors that went into Passman's decision to conduct the protective sweep in this case included Thurman's nervousness, his inconsistent answers, inability to get in touch with the owner, and his overall evasiveness.   *Id*.   On re-direct, in response to a leading question, Passman agreed that he conducted the protective sweep to look for "armed people."   (Tr. 54).   He also agreed that the fact that there had been not one, but two alleged shootings involving a rifle and that Thurman also allegedly had a rifle factored into his

16

concerns for officer safety.   (Tr. 54-55).   Schmitz was not involved in Passman's decision to conduct a protective sweep.   (Tr. 61-62).

Passman explained that they conducted two protective sweeps because they always conduct a secondary search with another set of eyes to look for places that they might have missed the first time.   (Tr. 43).   They always double-up and double-check everything.   *Id*.

When Passman, Schmitz, and Lambert went to the apartment that day, they did not have a foregone expectation that they were going to search the apartment no matter what.   (Tr. 19, 65-66, 87).   During the protective sweep, Passman observed several men's items in the room, including pictures.   *Id*.   In the far left corner was an AK style rifle.   *Id*.   On the nightstand, there was a fairly large plastic bag of suspected marijuana.   *Id*.   The marijuana was in a bag, tied up in a knot.   (Tr. 50).   It was not until after they conducted the sweep that Passman felt like they had sufficient grounds to ask for a search warrant.   (Tr. 49).

The officers did not find a red bag during the search.   (Tr. 52).   Passman did not recall finding any loose blunts or burned marijuana residue.   (Tr. 54).   If they had, the officers would have seized it.   *Id*.   Passman did not smell marijuana at the apartment because he had been battling a sinus infection for the past two weeks.   (Tr. 55).   Critically, however, Lambert testified at the hearing that he smelled marijuana the moment the officers walked up to the front door.   (Tr. 84).

Detective Lambert had just come over to the detective division and so detective Schmitz was training and assisting him with the search warrant.   (Tr. 25, 66).   Passman stated that one of the reasons they obtained a search warrant was because there still could have been a rifle in a

17

red bag hidden somewhere in the apartment.   (Tr. 55).   This might have been the first search

warrant that Lambert had ever drafted.   (Tr. 82).

Schmitz explained that when he said on the video that they had a "cluster" there, he

meant that there was a lot going on:    they had a female in custody, kids crying, and people

ganging up outside.   (Tr. 68-69).   Schmitz further explained that when he used the phrase

"creative writing" during his phone call in the car to Detective Mahoney, he meant that they had

to be "thorough."   (Tr. 69-70).   It did not mean that they were going to make things up.   *Id*.

Passman later confirmed from Karlefa Jones that although she was listed on the lease,

Thurman lived there and took care of the payments.   (Tr. 28).

## Law and Analysis

Defendant contends that the officers violated his Fourth Amendment rights when they

went to his residence before obtaining a warrant, then there was insufficient grounds to support

the protective sweep, and but for the illegal protective sweep and "creative writing," there was

no probable cause for the subsequent search warrant.   *See* M/Suppress [doc. # 25].

Consequently, he argues that all evidence seized in this case should be suppressed as "fruit of the

poisonous tree."

As an initial matter, the government contends that defendant does not enjoy standing to

challenge the search of the apartment.   The court will address this issue before proceeding to

consider the merits of the Fourth Amendment challenge.

## I.        Standing

The "capacity to claim the protection of the Fourth Amendment depends . . . upon

whether the person who claims the protection of the Amendment has a legitimate expectation of

privacy in the invaded place."   *Rakas v. Illinois*, 439 U.S. 128, 143 (1978); *United States v. Parks*, 684 F.2d 1078, 1082 (5th Cir. 1982).   A subjective expectation of privacy is legitimate if it is "one that society is prepared to recognize as reasonable."   *Rakas*, 439 U.S. at 143-44.   Furthermore, "[a] houseguest has standing to challenge a search of his host's home because the guest has a legitimate expectation of privacy there."   *United States v. Solis*, 471 Fed. Appx. 409, 410 (5th Cir.2012) (citing *Minnesota v. Olson,* 495 U.S. 91, 110 S.Ct. 1684 (1990)).   Thus, an overnight guest in a home has a legitimate expectation of privacy in that home.   *See Olson*, 495 U.S. 91, 96-97 (1990) (a defendant's "status as an overnight guest is alone enough to show that he had an expectation of privacy in the home that society is prepared to recognize as reasonable").

Here, although Thurman told the officers that he lived elsewhere, he also told them that he frequented that apartment.   Moreover, the officers found evidence in the bedroom indicating that Thurman lived there, including menswear, a medical summary of care document for Thurman, a paystub addressed to Thurman, medication, a healthcare card in Thurman's name, and photographs.   (Gov't Exhs. 11-24).   In fact, Passman later confirmed from Karlefa Jones that although she was listed on the lease, Thurman lived there and took care of the payments. (Tr. 28).

Given these circumstances, it is more probable than not that, *at minimum*, defendant had spent the night at Parkview Apt. No. 74, and consequently, he enjoys standing to contest the search.

## II.    Knock and Talk

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."   U.S. Const. amend. IV.[4]   Thus, "a police officer not armed with a warrant may approach a home and knock, precisely because that is no more than any private citizen might do."   *Florida v. Jardines*, 569 U.S. 1; 133 S.Ct. 1409, 1416 (2013) (citation and internal quotation marks omitted).   Indeed, "[f]ederal courts have recognized the 'knock and talk' strategy as a reasonable investigative tool when officers seek to gain an occupant=s consent to search or when officers reasonably suspect criminal activity."   *United States v. Jones*, 239 F.3d 716, 720 (5th Cir. 2001).   A "knock and talk" is a reasonable police tactic to identify a home's occupants and to further investigate complaints of illegal activity.   *Id.*

In this case, the officers approached Parkview Apt. No. 74 in response to an anonymous tip that Eugene Thurman, a convicted felon, resided there and possessed an assault weapon. The uncorroborated anonymous tip did not provide the officers with probable cause to obtain a search warrant.   Accordingly, they went to the apartment with the intention of making contact with the occupant for purposes of substantiating the complaint.   The officers did not have any preconceived notions about searching the apartment prior to their arrival.   In fact, they did not even expect Thurman to answer the door.   Under these circumstances, the "knock and talk" was reasonable and permissible.   *See Jones, supra*.

---

[4]   The protections of the Fourth Amendment extend to the states through the Fourteenth Amendment.   *Dunaway v. New York*, 442 U.S. 200, 207 (1979).

### III.     Exigency and the Protective Sweep

"[W]hen it comes to the Fourth Amendment, the home is first among equals.   At the Amendment's very core stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion."   *Jardines, supra* (citation and internal quotation marks omitted).   Nevertheless, an otherwise unconstitutional intrusion into a residence may be excused by exigent circumstances such as the pursuit of a suspect, the loss of evidence, and the immediate safety risk to officers.   *Jones*, 239 F.3d at 720 (citation omitted).

"A defendant normally bears the burden of proving by a preponderance of the evidence that the challenged search or seizure was unconstitutional.   However, where a police officer acts without a warrant, the government bears the burden of proving that the search was valid." *United States v. Waldrop*, 404 F.3d 365, 368 (5th Cir. 2005) (internal citations omitted).

In this case, the government contends that the officers entered and searched the apartment without a warrant for purposes of conducting a protective sweep.   With respect to officer safety, the protective sweep doctrine represents a "well-delineated" exception to the warrant requirement.   *Maryland v. Buie*, 494 U.S. 325, 110 S.Ct. 1093 (1990).   "A protective sweep is a quick and limited search of premises . . . conducted to protect the safety of police officers or others.   It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding."   *Id.* at 327 (internal quotation marks omitted).   An "arrest is not always, or per se, an indispensable element of an in-home protective sweep . . ."   *United States v. Gould*, 364 F.3d 578, 584 (5th Cir.2004) (en banc), *abrogated by Kentucky v. King*, 563 U.S. 452; 131 S.Ct. 1849 (2011); *United States v. Mata*, 517 F.3d 279, 286 (5th Cir.2008) ("The government need not prove the sweep was incident to a lawful arrest.").

The following elements, however, do serve as requirements for a valid protective sweep:

> First, the police must have entered legally and for a legitimate law enforcement purpose.

> Second, the officers must have a reasonable, articulable suspicion that the area to be swept contains a person posing a danger to those on the scene.[5]

> Third, the protective sweep must be limited to a cursory inspection of only those spaces where a person may hide; it is not a full search of the premises.

> Finally, officers must conclude the sweep once they have dispelled their reasonable suspicion of danger, and they may not continue the sweep after they are no longer justified in remaining on the premises.

*Mata*, 517 F.3d at 286 (citing *Gould*, 364 F.3d at 587) (footnotes removed).

As an initial matter, the court observes that a "knock and talk" police practice constitutes a legitimate law enforcement purpose that may support a protective sweep. *Gould*, 364 F.3d at 590. Thus, the officers were at the apartment complex for a legitimate purpose. *See* discussion, *supra*.

The court further finds that, in this case, the sweep was limited to areas where an individual could have hidden and did not last any longer than necessary. The officers observed the baggie of marijuana in plain view on the nightstand. In addition, the area in front of the bed where the gun was seen appeared to be wide enough space for someone to have crouched down to avoid detection. Thus, the officers were permitted to look there. Moreover, it took the officers only a little over 30 seconds to find the weapon after the search began. They also exited the apartment as soon as they performed their secondary, precautionary search.[6]

---

[5] "[A] sweep is [also] permissible where necessary to prevent the possible destruction of . . . drugs, especially where this danger is combined with reasonable concern for the safety of officers or civilians." *United States v. Watson*, 273 F.3d 599, 603 (5th Cir. 2001)

[6] There is no indication that the officers uncovered any additional contraband during the second

Accordingly, the pivotal issue becomes whether the officers had a reasonable, articulable suspicion that the area to be swept contained a person posing a danger to those on the scene. Passman – the officer who decided to conduct the sweep – stated that his concerns were motivated by Thurman's nervousness, his inconsistent answers, his inability to get in touch with the owner, the fact that there had been two shootings involving a rifle, and that Thurman also allegedly had a rifle.   These factors tend to support a suspicion that Thurman might have had something to hide, for example, a dangerous weapon.   However, they do not indicate a reasonable suspicion that there was someone else in the apartment who posed a danger to the officers.

In fact, Passman's decision to stand in the open doorway with his back to the hallway where the bedrooms were located belies any claim that he reasonably feared the presence of an armed person in the apartment.   The government contends that Passman stood in the doorway to prevent Thurman from accessing any weapon inside the apartment.   However, the officers were the ones who directed Thurman to stand next to the open doorway, after he had tried to move farther down the second-floor landing *away* from the doorway.[7]   If the officers had accompanied Thurman down the landing, then they would have been in a position of comparative safety from anyone hiding in an apartment bedroom.

---

search.

[7] The government contends that Thurman tried to walk away from the scene and likened it to headlong flight.   (Gov.'t Brief, pgs. 11-12).   However, Thurman never got a chance to go anywhere because the officers immediately arrested his movement and repositioned him in the corner, next to the door.   Thurman just as likely intended to go stand near his girlfriend and her child.

In addition, Passman inexplicably permitted three minutes to elapse before opting to conduct the protective sweep.   Certainly, if the alleged danger was as serious and potentially imminent as claimed, it stands to reason that Passman would have conducted the sweep earlier in the encounter, rather than waiting until after Thurman had reaffirmed his refusal to consent to a search.

The undersigned is mindful that in the exigent circumstances analysis, if reasonable minds could differ, then "the courts should not second-guess the judgment of experienced law enforcement officers concerning the risks of a particular situation." *United States v. Blount,* 123 F.3d 831, 838 (5th Cir.1997) (citation omitted).   Furthermore, the subjective intent of the officers is not determinative, nor probative.   *See King*, 563 U.S. at 464.   However, an officer's behavior can reveal whether his conduct was objectively reasonable.   *See Jardines, supra* (officer's behavior objectively revealed purpose to conduct a search).   In this case, Passman's decision to stand in the open doorway and repeatedly expose his back to the inside of the apartment over a three-minute period, undermines any objective suspicion that the area contained a person posing a danger to the officers.[8]

In a forlorn attempt to support its argument regarding the potential presence of other armed persons in the apartment, the government emphasized that Passman testified about his experience investigating "shootouts down there where they're running all over the complex, running into apartments that they don't even belong in or don't live, don't even know anyone in

---

[8] The officers did not express any concern that the apartment lessee, Karlefa Jones, might have been inside.   Rather, they appeared confident that she was at work, while Thurman remained at the apartment with his girlfriend.   They later learned that Ms. Jones apparently had subletted the apartment to Thurman.

there."   (Gov.'t Post-hearing Brief, pg. 8) (citing Tr. 35).   However, the foregoing testimony was taken out of context and did not pertain to why Passman decided to conduct a protective sweep.   Furthermore, there was no evidence that there was an active shootout at the time that the officers decided to conduct their "knock and talk."

The government extensively discussed *United States v. Jordan*, where this court sustained the protective sweep of a home, despite a difference of opinion between the on-scene officers regarding the necessity of the sweep.   *United States v. Jordan*, No. 13-0274, 2014 WL 2003119, at *6 (W.D. La. May 15, 2014).   In *Jordan*, however, there was evidence that other individuals had been on the premises earlier that day, and thus, someone else could have been inside the house with access to firearms and/or the narcotics.   *Id*.   Such evidence is absent here.

The government also contends that the protective sweep in this case is consistent with the decision in *United States v. Albarado*, 555 Fed. Appx. 353, 355 (5th Cir.2014).   In *Albarado*, however, the defendant advised the officers that there was at least one other person in the residence.   *Id*.   In this case, the officers removed all of the persons that they observed from the apartment and had no reasonable *articulable* suspicion that anyone else was there.

In its brief, the government contrasted the decision in *United States v. Menchaca-Castruita*, where the court declined to find exigent circumstances because the officer had no articulable reason to believe that someone might be inside the residence, despite the officer's belief that 1) there were drugs in the home, 2) the possibility that someone else might be inside, and 3) that firearms often are the "tools of the trade," for drug traffickers.   *United States v. Menchaca-Castruita*, 587 F.3d 283, 295 (5th Cir.2009).

If anything, however, *Menchaca-Castruita* supports a finding here that the protective sweep was not supported by a reasonable articulable suspicion.   The court emphasized that

> [t]here will always be some *possibility* that an unknown person might be hiding somewhere inside a residence, waiting for an opportunity to attack law enforcement officers or to destroy evidence. A finding of exigent circumstances, however, must be based on *more than a mere possibility*; it must be based on an officer's reasonable belief that the delay necessary to obtain a warrant will facilitate the destruction or removal of evidence or put officers or bystanders in danger.

*Id.* (emphasis added).

Conversely, in *United States v. Watson*, the Fifth Circuit, after noting that the mere presence of illegal drugs and weapons did not justify a protective sweep, proceeded to sustain the validity of a sweep based on an officer's statement that, although he lacked a specific reason to believe that other individuals were in the house, the possibility always exists.   *Watson*, 273 F.3d at 603.

Nevertheless, even if *Menchaca-Castruita* and *Watson* could be reconciled with one another, that would not change the outcome here.   In this case, detective Passman's own conduct discounted any objective suspicion that the area to be swept harbored an individual posing a danger to those on the scene.   Accordingly, a protective sweep of the apartment was not justified and therefore, unreasonable.

## IV.    The Independent Source Doctrine and the Search Warrant

Generally, "evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search or seizure.   This prohibition applies as well to the fruits of the illegally seized evidence."   *United States v. Wallace*, 885 F.3d 806, 810 (5th Cir. 2018) (quoting *United States v. Calandra*, 414 U.S. 338, 347 (1974)).   The purpose of this exclusionary rule is to deter unlawful police conduct:   by refusing to admit

evidence gained as a result of conduct that deprives the defendant of some right, "the courts hope to instill in those particular investigating officers, or in their future counterparts, a greater degree of care toward the rights of the accused."   *United States v. Pope*, 467 F.3d 912, 916 (5th Cir. 2006) (quoting *United States v. Leon*, 468 U.S. 897, 919 (1984)).   However, the exclusionary rule is not without limits, and suppression of evidence should be "ordered only on a case-by-case basis and only in those unusual cases in which exclusion will further the purposes of the exclusionary rule."   *Id.*

"Evidence that would otherwise be suppressible is purged of the primary taint if it derives from an independent source, if the link to the illegally secured evidence is attenuated, or if it would inevitably have been discovered without the aid of the illegally obtained evidence."   *United States v. Estrada*, 683 Fed. Appx. 308, 311 (5th Cir.2017) (citing *United States v. Runyan*, 275 F.3d 449, 466 (5th Cir. 2001)).   The independent source doctrine provides that "even if police engage in unconstitutional activities . . . evidence discovered during such illegal activities is nonetheless admissible if it is also discovered through an independent source." *Id.* (citing *United States v. Restrepo*, 966 F.2d 964, 969 (5th Cir. 1992)).

The independent source doctrine contemplates a two-part analysis:   "(1) does the warrant affidavit, when purged of tainted information gained through the initial illegal entry, contain sufficient remaining facts to constitute probable cause ('probable cause'); and (2) did the illegal search affect or motivate the officers' decision to procure the search warrant ('effect of the illegal entry')."   *Estrada, supra* (quoting *United States v. Hassan*, 83 F.3d 693, 697 (5th Cir. 1996)).[9]

---

[9]  Relatedly, the inevitable discovery rule provides an exception to the exclusionary rule.   *Nix v.*

Appling the foregoing process here, the court finds that after purging the warrant application of the tainted information gained through the unjustified protective sweep, the remaining information still provided probable cause to support issuance of the warrant. For example, the officers had received an anonymous tip that Thurman, a convicted felon, possessed an assault weapon at the subject apartment. More importantly, however, the application stated that the officers detected an odor of marijuana coming from the apartment. Of course, "[d]istinctive odors, detected by those qualified to know them, may alone establish probable cause." *United States v. McKeever*, 906 F.2d 129, 132 (5th Cir.1990) (citations omitted).

Needless to say, defendant strenuously contests the veracity of the marijuana odor detection and emphasized that aside from a lone reference to the odor by Detective Schmitz after the protective sweep, no other officer mentioned smelling marijuana on the body camera footage. Defendant further noted that no used marijuana blunts were found in the apartment, and the only marijuana actually discovered was inside a small, tied-up baggie. Conversely, however, detective Lambert, who was called as a witness by defendant, testified that he smelled the marijuana as soon as the detectives walked up to the apartment door.

Even so, that raises the reasonable question why Lambert did not say anything about the marijuana odor until he drafted the warrant application. One plausible explanation is that he did not realize the significance of that evidence at that time. While Lambert had been a police officer for a significant number of years at the time of the encounter, he only recently had

---

*Williams*, 467 U.S. 431, 444 (1984). To apply, the government bears the burden of proving by a preponderance of the evidence: "(1) a reasonable probability that the contested evidence would have been discovered by lawful means in the absence of the police misconduct and (2) that the government was actively pursuing a substantial alternate line of investigation at the time of the constitutional violation." *United States v. Lamas*, 930 F.2d 1099, 1102 (5th Cir. 1991).

transferred to the detective division.   It would not be unusual for someone new in his position to defer to more senior officers.   In fact, detective Schmitz candidly told Thurman, in front of Lambert, that the officers were not there looking for dope or weed.

Defendant makes much of the fact that detective Schmitz told officer Mahoney on the phone that they had a "cluster" down there, and that it was going to take some "creative writing." However, Schmitz previously had referred to the "cluster" when he observed the gathering crowd of people in the complex who possibly had been roused by the heart-wrenching cries of Thurman's girlfriend's daughter after the officers handcuffed her mother.

As to the "creative writing" element of his comment, Schmitz explained that he meant only that they were going to have to be thorough.   During the drafting of the warrant application, Lambert finally must have articulated to Schmitz that he smelled the marijuana odor, even before the protective sweep.   The court accepts the veracity of Lambert's testimony made under oath at the hearing, which he also made under oath before the state court judge.

Under the second prong of the independent source doctrine, the government must show that the agents would have sought the warrant even if the illegality had never occurred.   *United States v. Grosenheider*, 200 F.3d 321, 328 (5th Cir.2000).   Here, the officers were conducting an alternate path to gain access to the apartment at the time of the protective sweep by continuing their efforts to reach the apartment lessee, Ms. Jones, at her place of employment.   After the protective sweep, they abandoned that effort and decided to seek a search warrant instead.

Furthermore, even before the protective sweep, detective Passman had expressed his intention to gain entry to the apartment by obtaining a warrant, if necessary.   While Passman was unable to smell the odor of marijuana because of a sinus infection, detective Lambert was

not so impaired.   In due course, and absent the sweep, Lambert undoubtedly would have disclosed to Passman that he had detected the odor of marijuana (as he eventually did to Schmitz).   At that point, Passman would have directed him to obtain a warrant on that basis.

In sum, the court finds that all of the evidence sought to be suppressed would have been discovered pursuant to an independent source, sufficient to withstand exclusion of the evidence as a result of the initial, invalid protective sweep.

## Conclusion

For the above-stated reasons,

IT IS RECOMMENDED that the motion to suppress [doc. # 25] filed by defendant, Eugene Thurman, be DENIED.

Under the provisions of 28 U.S.C. §636(b)(1)(C) and FRCP Rule 72(b), the parties have **fourteen(14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.   A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof.   A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing.   Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR,**

**FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL**

**FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

In Chambers, at Monroe, Louisiana, this 2nd day of November 2020.

KAREN L. HAYES
UNITED STATES MAGISTRATE JUDGE